## HUDDLESTON *v.* STATE.

[98 So. 839.  No. 23564.]

(Division B. Feb. 11, 1924.)

1. HOMICIDE. *Evidence that shortly before killing accused intoxicated admissible; evidence that shortly before killing accused stated that he intended to kill unnamed man admissible.*

   In a homicide case, where facts of the killing are only seen by one state witness and the defendant and where they are in radical conflict, it is not error to introduce in evidence the fact that the defendant shortly before the killing was intoxicated and was saying that he intended to kill a man, though he did not name any particular person whom he intended to kill.

2. HOMICIDE. *Sustaining objection to part of testimony of one testifying regarding tracks not error.*

   Where a witness, undertaking to describe the ground where the killing occurred, said, "I looked, and Victor Huddleston was walking just not quite in the center of the road, to the east of the road, and Lish Harralson's feet" (objected to; sustained; exception), it is not error, where the witness is permitted to state what he saw, where he was not an eyewitness to the killing.

3. CRIMINAL LAW. *Testimony as to how shell in gun used in killing appeared to have been discharged held admissible.*

   Where defendant killed the deceased with a gun but claimed the gun was accidentally discharged in being breeched, and where the gun was left at the scene of the homicide and was examined by a witness who said that the shell in the gun was discharged by concussion from the hammer and that there was no indication of its being discharged in the manner testified to by defendant and where the gun and the shell were offered in evidence, it was not error to permit such evidence to be given.

4. HOMICIDE. *Instruction on "malice aforethought" approved.*

   In a murder case it is not error to give the following instruction where another instruction by the state defined manslaughter; "The court instructs the jury that while 'malice aforethought' is a necessary ingredient to the crime of murder, still malice aforethought means the same as killing a human being with the deliberate design to effect the death of the person killed; and this malice aforethought and deliberate design do not necessarily mean hatred or ill will, and need not exist in the mind of

the' defendant for any definite time, not for days or hours or even minutes, but if the deliberate design to kill exists but for an instant at the very time the fatal shot was fired, this is sufficient premeditation and deliberation to constitute the offense, unless the jury should believe from all the evidence in the case that the defendant was excusable."

5. CRIMINAL LAW. *Instruction as to consideration of weight of evidence held not erroneous as to comment thereon.*

In a murder case where the evidence is conflicting, it is not a comment on the weight of the evidence to give the following instruction: "The court instructs you that in reaching your conclusions as to the facts in this case and in your consideration of the evidence you are the sole and only judge of the weight of the testimony and the credibility of the witnesses; and it is right and proper, in determining the weight to be given to the testimony of any witness, that you should take into consideration the character of the witness, his opportunity for correct observation, his powers of recollection, the reasonableness of his testimony in view of the undisputed facts, and anything and everything in connection with the witness which, according to human reason, and in the light of human experience, will aid in the determination of the question as to the proper weight to be given to their testimony.' '

6. HOMICIDE. *Peremptory instruction should not be given where evidence of killing conflicting.*

Where the evidence is conflicting as to how a killing was done, a peremptory instruction should not be given, although there was only one eyewitness and it was proven that he had on several occasions out of court stated that he did not know how it occurred. It is for the jury to decide conflicts in evidence and the credibility to be given to the various witnesses.

APPEAL from circuit court of Newton county.

HON. G. E. WILSON, Judge.

Victor Huddleston was convicted of murder, and he appeals. Affirmed.

*Byrd & Byrd,* for appellant.

The objection to the testimony in regard to whether defendant was drinking or not was well taken. From the testimony of the witness as adduced by the state

it would seem that the crime for which defendant was being tried was a violation of the liquor law. There is not a line of testimony in the record even remotely suggesting that liquor had anything to do with the killing. This testimony was highly prejudicial.

The alleged threat, in these words: "He was around there drunk, and I went to him and told him he ought not to go on that way, and what was the matter with him? And he said he was going to kill him a man—he was going to kill him a man to be called bad"—was not made against the deceased, and the deceased was not present, and if the defendant really made the statement it could apply 'with equal force to every man in existence. *Henson* v. *State*, 6 So. 463. There is an utter lack of identification of either the shell or the gun.

As to the actual killing, and the facts immediately connected therewith, there were but two witnesses, the state's witness, Glover Brown, and the defendant himself. The instruction given is upon the weight of the evidence and is violative of section 1578, Hemingway's Code, which provides that the defendant is a competent witness in his own behalf. *Buckley* v. *State*, 62 Miss. 705.

The peremptory instruction for the defendant should have been given because the testimony for the state was completely controverted, impeached and contradicted. By an overwhelming weight of the evidence the state's only witness to the homicide was shown to be a consummate liar and his testimony was impeached so completely that the necessity for a jury's verdict vanished.

*J. H. Sumrall,* Assistant Attorney-General, for the state.

The admission of the testimony as to the drunkenness or sobriety of appellant on the night of the homicide was entirely proper as a circumstance to prove a motive for the overt act which had already been testified to by

state witnesses, when the testimony in question was introduced, and as a connecting fact between a former hostile statement made about deceased by appellant, and the actual homicide. Again, this testimony became important as touching the credibility of the appellant himself as a witness in his own behalf. 28 R. C. L., page 620, sec. 209; *Payton* v. *State,* 60 Texas, 475, 132 S. W. 127.

Counsel for appellant criticises the third instruction given for the state, which is a correct and fair announcement of the law as to the province of the jury in determining the credibility of witnesses. *Buckley* v. *State,* 62 Miss. 705, cited by counsel, has no application to the instruction complained of since the Buckley case only condemns calling the jury's attention to the interest of the witness as influencing his testimony, while the instruction complained of is free from any such objection. As authority for the giving of this instruction, and in support of the rule announced see *Thomas* v. *State,* 61 Miss. 60; *Owen* v. *State,* 63 Miss. 450; *Miller* v. *State,* 35 So. 690; *Waldrop* v. *State,* 54 So. 66; *Peddre* v. *State,* 54 So. 721; *Vails* v. *State,* 94 Miss. 365.

Appellant lays great stress on what he chooses to term the "lying testimony" of state witness Brown. It rather appears that Brown's idea about the matter was that he should not discuss this matter indiscriminately with people generally, he having the idea, as stated by him on the stand, that it would be unlawful for him to do so; and this idea was no doubt strengthened by the apparent interest of such a large number of people, who for some reason desired to have him discuss his knowledge of the actual shooting. But even though we adopt every contention of counsel with reference to all the state's witnesses, certain undisputed facts and circumstances remain which, properly considered, lead to no other conclusion than the one of guilt.

Argued orally by *J. R. Byrd,* for appellant, and *J. H. Sumrall,* Assistant Attorney-General, for the state.

ETHRIDGE, J., delivered the opinion of the court.

The appellant was indicted, tried, and convicted of murder and sentenced to imprisonment for life. The killing occurred very late at night following a fish fry or party at which the deceased and the defendant were on said night. There were two eyewitnesses to the killing—Glover Brown, a state witness, and the defendant. The killing as detailed by the state witness was the culmination of a dispute or argument between the deceased and the appellant, in which dispute the deceased called the defendant a "damn liar," and according to the state's witness the defendant stated, "If you call me that again, I will shoot your head off." Whereupon the deceased repeated the statement, and the defendant stepped in front of him, threw up the gun, and fired; the shot taking effect in the left eye, tearing away the eye, the left cheek bone, and the lower part of the skull. After the shooting the defendant turned and ran back southwardly in the direction from which they came, and disappeared from the community, and was later arrested in the Delta and returned for trial.

The state's witness states that when the defendant ran past him that he then ran in the opposite direction and caught up with some other parties, who were also returning from the dance, and told them about the matter; that they went on to a white man's house and told them about it, and the state's witness and two or three others returned to the place where the deceased was lying; that the gun was lying near the deceased and was a single-barrel shotgun, which the deceased and some others, including the brother of the defendant, had carried to the fish fry or party. The defendant was not with them until after they reached the party, but when

they started to leave the party he and the deceased and a number of others left together; the deceased then having the gun. The party separated at a certain point in the road; the deceased, the defendant, and the state witness Brown going one way, and the others taking another road. The defendant at some point on the journey took the gun before any dispute arose. It seems from the state's witness' testimony that the dispute was about a girl.

The state introduced evidence of a previous threat against the deceased made some three days before the shooting, growing out of some contest or rivalry between the defendant and the deceased in their work, which was swamping for a lumber concern. It seems from the evidence that the deceased could do more rapid work and won in these contests, and that this irritated the defendant.

It was also proved by the state that during the party the defendant was intoxicated, and that he threatened to kill him a man and buy a black box. The testimony concerning this evidence as to the drunkenness and these threats was objected to, the objection overruled, and exception taken.

The defendant's version of this affair was that he and the deceased were good friends, and that the deceased was going home with him to spend the night; that the deceased had the gun and gave it to him requesting him to carry it awhile, and that he was carrying the gun unbreeched on his arm, and that he did not know it was loaded; that he and the deceased were walking along talking, and the state's witness Brown was behind them some steps, and not knowing the gun was loaded he decided to breech the gun, and in breeching it the gun discharged, killing the deceased, his friend; and that he was excited and ran back to a relative and told them about it and was advised to leave, which he did because so advised by relatives. He denied the threats, denied

being intoxicated, and proved by others that the gun was a tricky gun and would sometimes fire on being breeched, but that he did not know that, and that he did not own the gun; it being owned by his brother, who was with the other party after they separated at the road.

The defendant also introduced numerous witnesses who contradicted the state's witness Brown by statements made by him to them immediately after the killing in which he stated that he was walking along about asleep some eight or ten steps in the rear, and that he was awakened by the gun, and that he did not know how it occurred. Also, by numerous subsequent statements up to the day of the trial in which he stated that he knew nothing of how the killing happened.

The state's witness on cross-examination admitted that he had not told how it happened until he took the stand, and that his reason for not doing so was that he did not think he had a right to, and that the law would not permit him to give his evidence except on the stand. He denied, however, some of the statements about which he was impeached.

There are numerous assignments of error, the first of which is that the court erred in introducing in evidence the defendant's condition as to drunkenness or soberness the night of the homicide and the purported threats made as above stated. We do not think it was reversible error to admit evidence as to the condition of the defendant shortly before the occurrence, and that he was threatening to kill some one, though not mentioning by name the party. The transaction here turns on conflicting statements as to how the killing actually happened, and the defendant's state of drunkenness or sobriety might be very persuasive in determining whether purposely he did the act or not, and also as showing his state of mind.

The second assignment of error is the admission over the objection of the defendant of the statement of one Laura Edwards, who stated that the defendant was at the party and was drinking, and stated that he had been trying to marry ever since he was grown but no one would have him, and that he was going to kill some one and buy a black box. A part of this statement, of course, was not admissible; but we do not think it was reversible error. The part of the statement that he had been trying to marry and could not find any one who would marry him was clearly incompetent, but we do not think it was so prejudicial as to call for a reversal of the case.

The third assignment of error is the sustaining of an objection to the testimony of a witness Pace as to the condition of the ground and what he observed at the scene of the homicide shortly thereafter. The statement of the witness with the objections is as follows:

"Did you see any signs of tracks around there that morning? Yes, sir. Tell the jury what you saw with reference to those tracks? As I walked up, Mr. Callahan and Mr. Massengale were standing over here, and the negro was lying in this position with his head to the southwest, in the ditch, and as I come up they spoke to me and said, 'Don't step over there, that is the tracks,' and I looked, and Victor Huddleston was walking just not quite in the center of the road, to the east of the road, and Lish Harralson's feet—(State objects. Sustained. Defendant excepts.) Tell about the tracks you saw. The tracks were nearly in the center of the road; one man's tracks. Which way were they going? To the north. What else did you see about the tracks? This track, or the track of this foot, and the track on the other side, the left foot, were about something like three feet apart. You saw a big track to the right? Yes, sir. It was going north? Yes, sir. Did you see another track? Yes, sir. To the left of that or to the right of it? To the left of that. What direction was it going?

North. Did you see any track where a man stepped
around and turned backwards? No, sir. Is that the
only track that you saw? Yes, sir. Did you see any
other track back down south? Yes, sir; I saw where
a man run out across the ditch eight or ten steps. Be-
hind from where the negro was dead? Yes, sir.''

We do not think the ruling complained of of sufficient
merit to reverse the case.

The next assignment of error is that the court erred
in admitting the testimony of Dowdle, a rebuttal wit-
ness for the state, as to the condition of the shell and
the gun found at the place of the killing. The basis of
this objection is that there was no sufficient identity of
the gun or of the shell, and that it was therefore in-
competent. This witness testified that he examined the
gun and the shell and that the shell was fired from a dis-
tinct impression from the hammer on the cap of the
shell; that there was no indication of such mark as would
be caused by the plunger being pressed against the shell.
We think the witness sufficiently showed that the gun
was in substantially the same condition it was at the
time of the killing, and that the gun introduced was the
gun found at the scene of the homicide, and the appel-
lant admits that he threw the gun down when he left the
scene of the homicide, leaving it there.

The next assignment of error is that the court erred
in granting instruction No. 2 for the state. This instruc-
tion reads as follows:

''The court instructs the jury that, while malice afore-
thought is a necessary ingredient to the crime of mur-
der, still 'malice aforethought' means the same as kill-
ing a human being with the deliberate design to effect
the death of the person killed; and this malice afore-
thought and deliberate design do not necessarily mean
hatred or ill will, and need not exist in the mind of the
defendant for any definite time, nor for days or hours
or even minutes, but if the deliberate design to kill ex-

ists but for an instant at the very time the fatal shot was fired, this is sufficient premeditation and deliberation to constitute the offense, unless the jury should believe from all the evidence in the case that the defendant was excusable.''

We do not think that it was error to grant this instruction. It is complained that the instruction eliminates the instruction for manslaughter given in the case. But we think on a careful reading of the instruction with others, taking all together as one harmonious pronouncement of the law, that the instruction is not subject to the criticism made of it. The latter part of the instruction, ''unless the jury should believe from all the evidence in the case that the defendant was excusable,'' if there was no instruction on manslaughter might be objectionable; but the state procured a manslaughter instruction, which, of course, must be considered in connection with this one.

It is next complained that instruction No. 3 is error. This instruction reads as follows:

''The court instructs you that in reaching your conclusions as to the facts in this case and in your consideration of the evidence you are the sole and only judges of the weight of the testimony and the credibility of the witnesses; and it is right and proper in determining the weight to be given to the testimony of any witness that you should take into consideration the character of the witness, his opportunity for correct observation, his powers of recollection, the reasonableness of his testimony in view of the undisputed facts, and anything and everything in connection with the witness which, according to human reason, and in the light of human experience, will aid in the determination of the question as to the proper weight to be given to their testimony.''

The criticism of the instruction is that it is charged on the weight of the evidence and that the court had no right to tell the jury what it stated in this instruction. We do not think the instruction is an instruction on the

weight of the evidence, but it merely tells the jury that it can take into consideration these things in determining the weight of the testimony and the credibility of the witnesses, and we see no objection to this instruction. The jury were left entirely to judge of the weight and credibility.

The next assignment is as to the instruction on the form of the verdict, which is in the usual form required for murder, with the addition that the jury may find the defendant guilty of manslaughter, or that the jury may find the defendant not guilty. It seems that the jury would be compelled to return one of the verdicts named, unless they failed to agree on a verdict at all.

It is next insisted that the defendant should have had a peremptory instruction, because the state witness was so completely impeached and destroyed as to be wholly unworthy of belief. The state's witness Brown was impeached by a large number of witnesses and on very material statements, but the state's witness thus impeached made a clear and plausible statement of the facts, and in addition to this the defendant fled the county where the homicide occurred and was arrested and brought back, and as above stated other people testified to specific threats against the deceased some three days prior to the killing. The jury have a right to pass upon the credibility of witnesses and the weight of the evidence, and in this case there is sufficient evidence to uphold their finding.

The judgment will therefore be affirmed.

*Affirmed.*